**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**FBR CAPITAL MARKETS & CO.**
**1001 19th Street North**
**Arlington, Virginia 22209**

        **Petitioner,**

        **v.**

**PETER D. HANS**
**4118 Aspen Street**
**Chevy Chase, Maryland 20815,**

        **Respondent.**

Case No. _____

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PETITIONER FBR CAPITAL MARKETS & CO.'S
PETITION TO PARTIALLY VACATE ARBITRATION AWARD**

Petitioner FBR Capital Markets & Co. ("FBR" or "Petitioner") respectfully submits this Memorandum of Law in support of its Petition, pursuant to the Federal Arbitration Act ("FAA") and federal common law, to partially vacate the arbitration award (the "Award") rendered on March 20, 2013 in the matter of Peter D. Hans and Scott Joseph Doyle v. FBR Capital Markets & Co., FINRA Dispute Resolution No. 12-01131 (the "Arbitration").  The Court should grant FBR's petition to partially vacate the Award because the award of contract-based damages to Respondent Peter D. Hans ("Respondent" or "Hans") is in manifest disregard of the laws of the Commonwealth of Virginia.  As described more fully below, the evidence adduced in this matter demonstrates first, that Petitioner FBR never reached an agreement to pay commissions based on the contested stock award with Respondent and second, that Respondent Hans brought his claim for contract-based damages only after the statute of limitations for oral contracts in the Commonwealth of Virginia had elapsed.  Inasmuch as the award against Petitioner contravenes

the clear precepts of Virginia law, the award exceeds the power granted to the arbitrators under Section 10(a)(4) of the FAA, and that portion of the award should be vacated.

## I.   STATEMENT OF FACTS

### A.   Overview of Respondent's Claims

On March 27, 2012, Respondent Hans, a former Institutional Sales Broker, and his former colleague Scott Doyle,[1] filed the Arbitration with the Financial Industry Regulatory Authority, Inc. ("FINRA") seeking compensation for unpaid commissions allegedly owed them.[2] *See* Exhibit A (Statement of Claims).  Specifically, Respondent claimed it was FBR's policy to pay all Sales Brokers a 14.5% commission on any sales made and that FBR breached this policy by failing to pay him the full 14.5% commission on a transaction related to a deal for an entity called XL Health.  *See* Exhibit B, (Claimants' Pre-Hearing Brief) at pp. 8-10. Pursuant to the arbitration agreement, Respondent's legal claims are governed by the laws of the Commonwealth of Virginia, where FBR is headquartered and Respondent worked. *See* Exhibit C, (FBR Arbitration Policy).

### B.   XL Health Transaction

In March 2007, FBR was retained to raise capital for XL Health.  *See* Exhibit D (FBR's Pre-Hearing Brief) at p. 2.  As part of their duties as Sales Brokers, Respondent Hans and his colleague Mr. Doyle initially were actively involved in trying to find investors interested in investing in XL Health through a broadly distributed public offering. *Id.*  However, when the sales force was unable to generate sufficient interest in a public offering of XL Health, FBR investigated alternative approaches to raising capital, ultimately shifting its focus from the Sales

---

[1] Respondent Hans brought his claims against FBR along with former Sales Broker Scott Doyle. FBR petitions the Court for vacatur of the Arbitration Panel's Award only as to Respondent Hans.

[2] During the relevant time period, Mr. Hans and Mr. Doyle were sales partners and split commissions each earned equally.

Department – where Respondent Hans and Mr. Doyle worked – to its Financial Services Department. *Id.* Mr. Doyle reached out through a contact to MatlinPatterson Global Advisors LLC, a private equity fund, to explore MatlinPattersons's interest in a private investment opportunity for the XL Health. *Id.* at p. 3. Ultimately, a private investment deal was negotiated through Respondent's Financial Services arm between MatlinPatterson and XL Health, and that deal was announced publicly on or about July 30, 2007. *Id.* at pp. 3-4.

For procuring this investment by MatlinPatterson Global Advisors LLC on behalf of XL Health, FBR received a fee from XL Health in the form of: (1) cash; and (2) stock in XL Health, a non-public company. *Id.* at p. 4. FBR received a cash fee of $6.8 million in March 2008. *Id.* at p. 5. In June 2008, FBR received XL Health stock as payment for the remainder of the fee it was owed pursuant to FBR's March 6, 2007 Engagement Agreement with XL Health. *Id.* at p. 5. Upon receipt, FBR booked the stock as a receivable valued at $5,000,000. However, in September 2008, the value of the XL Health stock was written down to $1,000,000 and in December 2008, the value of this stock was written down to $0. *Id.* Two and a half years later, in March 2011, FBR received $5.5 million from the sale of the XL Health stock. *Id.* at pp. 5-6. No one at FBR received a commission in 2008, or at any future date, in consideration of the stock received from the XL Health deal. *See* Exhibit E (Hearing Transcript) at pp. 567-70.

### C.   Compensation Paid To Respondent Related to the XL Health Deal

At the time FBR undertook the XL Health deal, it did not have a written commission plan or policy describing how its Sales Brokers would be compensated. *See id.* pp. 127-131, 370-373, 680-682. FBR did have a practice of compensating its Sales Brokers at a rate of 14.5% of the value of primary and secondary transactions they completed. *Id.* at pp. 131-132, 411. Primary transactions involved the investment of primary capital through a sales-led distribution process,

such as the sale of 144A securities. *Id.* at pp. 411-414. Secondary transactions involved trading of the existing stock of a company. *Id.* at p. 412. The XL Health transaction, as finally completed, involved neither primary nor secondary transactions. *Id.* at pp. 411-412, 618. In any event, at no time relevant to the XL Health transaction was there a written commission agreement between FBR and Respondent incorporating that practice or otherwise promising 14.5% commission payments all for deals they completed. *Id.* at pp. 127-131, 370-373, 680-682.

FBR determined that because the XL Health deal was ultimately a private transaction, led by the banking team, and not the sales force, compensation to Respondent and his colleague would not be calculated at the 14.5% rate traditionally paid on primary or secondary transactions. *Id.* at 411-414. Accordingly, Adam Fishman, Senior Managing Director, Head of Institutional Sales, and Jon Billings, Executive Vice President, in conjunction with President and Chief Operating Officer Richard J. Hendrix and certain others, discussed how to fairly and equitably compensate all the individuals who contributed to the deal. *See* Exh. D at p. 4.

In determining Respondent's compensation, FBR took several factors into consideration including his – and Mr. Doyle's – role in the deal and the work they performed on the transaction. *Id.* Ultimately, FBR determined that Respondent and Mr. Doyle would receive a 10.875% commission paid on the "selling concession" of the cash fee. *Id.* Immediately following FBR's receipt of the cash fee, Respondent and Mr. Doyle were paid a total of $370,198.56 through the March 21, 2008 payroll. *Id.* at p. 5. Because they shared the account, this amount was shared equally between them at $185,099.28 each. *Id.*

For the XL Health deal, no agreement was ever reached with Respondent to pay a commission on receipt of the stock. FBR received its share of XL Health stock in June 2008, but made no payment to Respondent at that time, although Respondent understood that FBR made

commission payments in the pay period following the receipt of commissionable funds. Although Respondent asked – orally and in writing – about an additional commission based on the stock portion of the fee received by FBR, and in August 2008 sent to Mr. Billings a detailed request for payment of the stock portion of the fee, FBR demurred.  *See* Exh. E at pp.  156-161; Exhibit F (Hans E-mail, Claimants' Arbitration Exh. 112).  Respondent left FBR's employ in February 2009 without receiving either payment or a promise that he would be compensated based on the receipt of the XL Health stock.

> ### D.       The Arbitration Proceedings & Award

A two-day arbitration hearing was held on March 4 and 5, 2013 in Washington, D.C. before the Arbitration Panel.  The testimony was undisputed that there was no written agreement in the record promising to pay Respondent or his colleague a 14.5% commission on any deal, although FBR acknowledged its practice of so paying commissions for primary and secondary transactions.  Exh. E at pp. 127-129; 371; 680-682.  The testimony showed that no agreement was reached between FBR and Respondent to pay Respondent any monies based on the receipt of XL Health stock, although the parties engaged in discussions regarding his hopes to be compensated on that basis.  *Id.* at pp. 158-163; Exh. F.  All that was alleged during the hearing was that Respondent claimed he was informed of FBR's commission policy verbally, through an e-mail and a presentation – although admittedly the first of these presentations did not occur until August 1, 2008.  Exh. E at pp. 128-129.  Mr. Billings testified that he thought an e-mail would likely be sent to the sales force when there was a change in the applicable commission rates.  *Id.* at pp. 618-619.  However, at no time was such an e-mail produced, nor was any testimony solicited by Mr. Billings – or anyone else – detailing the contents of such a communication, or the terms laid out therein.

The Arbitration Panel nevertheless awarded partial judgment in favor of Respondent in the amount of $267,960.00, finding that he was owed 14.5% commission on the value of the stock paid by XL Health, plus prejudgment interest.  Exhibit G (Arbitration Award).  In doing so, the Arbitration Panel also rejected FBR's arguments that Respondent's claims were untimely based on an alleged oral agreement to pay him for the XL Health stock made more than three years in advance of his demand.  *Id.*  However, the Arbitration Panel rejected Respondent's claims for additional commission payments on the value of the cash portion of the deal (i.e., the difference between 14.5% commission he claimed he was owed and the 10.875% commission paid) for which he received compensation in March 2008.  *Id.*

Although Respondent knew that FBR had failed to pay any commissions on the stock received from XL Health as soon as June 2008, he tried to negotiate an agreement for additional compensation based on receipt of that stock from that time through his departure from FBL in February 2009.  No agreement was reached.  Nevertheless, he failed to file a claim alleging failure to pay until March 2012, nearly 4 years after FBR was awarded the XL Health stock, and more than three years after he left FBR's employ.

## II.   STANDARD OF REVIEW

The Court may review and vacate an arbitration award on statutory and non-statutory grounds.  Under the Federal Arbitration Act ("FAA"), a court may only vacate an arbitration award:  (1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators, or either of them; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject

6

matter submitted was not made.  9 U.S.C. § 10(a).  The party challenging an arbitration award bears the burden of demonstrating that one of the statutory grounds set forth in the FAA exists. *See Al-Harbi v. Citibank, N.A.*, 85 F.3d 680, 682, 318 U.S. App. D.C. 114 (D.C. Cir. 1996).  In addition to the statutory grounds for vacatur set forth under the FAA, this Circuit has stated that vacatur of an arbitration award is proper if the award demonstrates that an arbitrator acted in manifest disregard of the law.  *Affinity Fin. Corp. v. AARP Financial, Inc.*, 468 Fed. Appx. 4, 5 (D.C. Cir. 2012) ("assuming without deciding that the 'manifest disregard of the law' standard still exists after *Hall St. Assocs. v. Mattel, Inc.*, 552 U.S. 576 (2008)"); *Regnery Publ'g Inc. v. Miniter*, 368 F. Appx. 148 (D.C. Cir. 2010) (same).  Thus, while judicial review of arbitration awards is limited, deference to an arbitration award is not absolute.  To vacate an arbitration award on the basis of an arbitrator's manifest disregard of the law, the Court must find that:  (1) the arbitrator knew of a governing legal principle yet refused to apply it or ignored it altogether; and (2) the law ignored by the arbitrator was well defined, explicit, and clearly applicable to the case.  *LaPrade v. Kidder, Peabody & Co.*, 246 F.3d 702, 706 (D.C. Cir. 2001) (citations omitted).

The record in this case demonstrates that the Arbitration Panel was aware of the governing legal principles.  FBR filed a Pre-Hearing Brief in which it argued that Respondent failed to state a cognizable breach of contract claim and that any alleged breach of contract claim would, in any event, be barred by the applicable three-year statute of limitations for implied or oral contracts.  *See* Ex. D at pp. 7-8, 9-12.  In addition, FBR raised these arguments at the arbitration hearing.  *See* Ex. E at pp. 722-755.  The only conclusion that can be reached upon a review of the record in this case is that the Arbitration Panel knew the applicable legal principles, but expressly decided to ignore them.  Accordingly, vacatur of the Award as to Respondent is

proper.[3]

## III.   ARGUMENT

### A.   THE ARBITRATION PANEL EXCEEDED ITS POWER AND ACTED IN MANIFEST DISREGARD OF VIRGINIA LAW, AND THEREFORE THE AWARD TO RESPONDENT MUST BE VACATED

"[W]here an arbitral award is issued by an arbitrator who exceeds his powers by acting in 'manifest disregard of the law,' *see Comedy Club, Inc. v. Improv West Assocs.*, 553 F.3d 1277, 1281 (9th Cir. 2009) 'an arbitrator's manifest disregard of the law remains a valid ground for vacatur of an arbitration award under [Section] 10(a)(4) of the [FAA].')". *Republic of Arg. v. BG Group PLC*, 764 F. Supp. 2d 21, 30 (D.D.C. 2011), vacated on other grounds, *Republic of Arg. v. BG Group PLC*, 2012 U.S. App. LEXIS 905 (D.C. Cir., Jan. 17, 2012).   Because Respondent cannot prove either a valid contract or a timely claim, the award in his favor should be vacated.

Under Virginia law, in order to establish a breach of contract claim, the Respondent must first establish the following:  (1) a legal obligation owed by FBR to Respondent, (2) a violation or breach of that right or duty, and (3) a consequential injury or damages to Respondent.  *See Brown v. Harms*, 251 Va. 301, 306, 467 S.E.2d 805, 807 (1996) (citations omitted).   In the case at bar, the conflict centers on the first element:  whether FBR was legally obligated to further compensate Respondent for the XL Health deal by paying him any additional commission based on the value of the XL Health stock.

---

[3] Where an arbitration panel does not provide an explanation for its decision, as is the case here, the Court must confirm the award if any justification can be gleaned from the record.  *Kurke v. Oscar Gruss & Son, Inc.*, 454 F.3d 350, 354 (D.C. Cir. 2006) (citation omitted); *LaPrade v. Kidder Peabody & Co.*, 94 F. Supp. 2d 2, 4 (D.D.C. 2000) (citations omitted).  In this case, the absence of evidence to establish either an agreement to pay the monies sought or a written agreement that would render his claims timely leave no basis for confirming the award.

1.      **No Evidence of An Enforceable Written Contract Was Presented At The Hearing**

A contract is "an agreement between two or more persons that creates an obligation to do or not to do a particular thing." *Buchanan v. Doe*, 246 Va. 67, 72, 431 S.E.2d 289, 292 (1993) (citation omitted). There is no presumption of a contract and the making of a contract or the representations on which a contract is based must be established by a preponderance of the evidence. *Mullins v. Mingo Lime, etc., Co.*, 176 Va. 44, 49, 10 S.E.2d 492, 493 (1940). To be valid and enforceable, a contract must be so certain that each party may have an action upon it and the minds of the parties must meet in mutual agreement on every material phase constituting the alleged agreement. *Belmont v. McAllister*, 116 Va. 285, 303, 81 S.E. 81, 87 (1914). Further, when the *entire agreement* has not been reduced to writing, parol evidence is admissible to establish the parties' entire contract. *High Knob, Inc. v. Allen*, 205 Va. 503, 506, 138 S.E.2d 49, 52 (1964) ("[w]here the entire agreement has not been reduced to writing, parol evidence is admissible, not to contradict or vary its terms but to show additional independent facts contemporaneously agreed upon, in order to establish the entire contract between the parties.").

 Here, although Respondent contends that there was a commission policy in place at the time of the XL Health deal which entitled him to receive 14.5% commission payment on all of his sales, there was no written documentation whatsoever entered into evidence to support this contention. Under the objective theory of contract, which controls in Virginia, an offer is made if a reasonable person in the offeree's position, in view of the offeror's acts and words and the surrounding circumstances, would believe that the offeror has invited the offeree's acceptance. *Chang v. First Colonial Savings Bank*, 242 Va. 388, 391-2, 410 S.E.2d 928, 931 (1991). Lacking any documentary evidence of a contract, all Respondent offered at the hearing was testimony that he received an e-mail communication confirming the commission payout rate.

However, at no time was evidence introduced by Respondent establishing when these purported e-mails were received; nor, importantly, that they constituted an "offer" as defined under Virginia law to pay Respondent a commission of 14.5% on every transaction that he worked on, regardless of the type of transaction it was.

Indeed, these communications, which neither party has a record of, do not demonstrate that there was a "meeting of the minds" or mutual assent to the formation of a contract requiring FBR to pay Respondent the additional monies he seeks. Respondent presented no evidence to support that any definite terms were agreed to concerning payment of commission for the XL Health transaction. The Fourth Circuit's decisions in *Jensen v. Int'l Bus. Machines Corp.*, 454 F.3d 382 (4th Cir. 2006), and *Schwam v. XO Communications, Inc.*, No. 05-1060, 2006 U.S. App. Lexis 7428 (4th Cir. Mar. 24, 2006), are particularly instructive in highlighting the shallowness of Respondent's arguments as they each demonstrate a situation in which a writing was, in fact, presented, but failed to constitute a binding contract.

In *Jensen*, the plaintiff was formerly employed as a sales representative by IBM and paid a salary, in addition to variable compensation. The plaintiff closed a large transaction that he determined was worth over $24 million to IBM. *Jensen*, 454 F.3d at 385. The plaintiff claimed that he was entitled to commissions from the sale based on the company's presentation of a new compensation plan in a brochure and employee quota letter, and based on how the company had calculated commission within the preceding 18 months. *Id.* at 385-86. The company paid the plaintiff less in commission than he anticipated, based on its policy which reserved the right to review any single transaction and pay a 1% commission on any single sale that exceeded 200% of a salesperson's annual quota. *Id.* The plaintiff claimed he was unaware of the policy and filed a lawsuit in the United States District Court for the Eastern District of Virginia to recover the

alleged unpaid commission amounts.  *Id.* at 386.  The district court granted IBM's motion for summary judgment and held that "the documents describing IBM's [compensation plan] did not constitute an offer which plaintiff could accept to form a binding contract and were at most . . . a policy of payment in which [IBM] reserved discretion to itself to make the payment and to determine its amount, much like it might handle year-end bonuses."  *Jensen*, 454 F.3d at 388.

Similarly, in *Schwam*, the Fourth Circuit affirmed the district court's dismissal of plaintiff's breach of contract claim concerning unpaid commissions.  Schwam had been employed as a salesperson with XO Communications and alleged that a supervisor orally modified the terms of his sales incentive plan when the supervisor told him that "XO would take care of him next year, and he would get a part of the commissions based on the amount of business that he brought to the table."  *Schwam*, 2006 U.S. App. LEXIS 7428, at *10.  The court held that assuming the sales incentive plan could be modified by an oral agreement, the alleged statements by the supervisor failed to constitute an enforceable oral modification because the statements were too indefinite.  *Id.* at *11 ("Virginia allows for the modification of written contracts if evidenced by *express mutual assent*") (citing *Stanley's Cafeteria, Inc. v. Abramson*, 226 Va. 68, 306 S.E.2d 870, 872 (1983) (italics added)).  In affirming the dismissal of the plaintiff's breach of contract claim, the Fourth Circuit noted that the plaintiff admitted that he did not know what percentage of revenue was orally promised, the amount of compensation to be paid, or even when such compensation would be paid based on the alleged oral promise.  *Id.* at *11-12.  Consequently, the plaintiff failed to show by "clear, unequivocal and convincing evidence" that there was a mutual intent to modify the terms of the sales incentive plan.  *Id.* (citing *Stanley's Cafeteria*, 306 S.E.2d at 873).

11

More recently, the Fourth Circuit further recognized that under Virginia law, statements lacking an unequivocal agreement to definite terms regarding commission payments fail to establish an enforceable contract. *Dodge v. CDW Government, Inc.*, 415 Fed. Appx. 485, 488 (4th Cir. 2011) ("not every statement professing an employer's future intention to pay benefits commits that employer to a binding contract . . . [t]o the contrary, a statement constitutes a contract offer only if it 'manifests a willingness to enter into a bargain'") (quoting *Jensen*, 454 F.3d at 388).

In this case, the FBR policies regarding commission payments governed payment of commissions for primary and secondary transactions, not a privately negotiated transaction, such as the XL Health deal.  At no time was there a written commission agreement setting forth the applicable commission rate and the type of transactions such rate would or would not apply to. Ex. E at pp. 127-131, 370-373, 680-682.  Indeed, FBR paid Respondent a commission rate of 10.875% on the cash fee of the XL Health transaction, demonstrating that the 14.5% was not absolute and could be modified.  In denying Respondent's request for damages for the difference between the 10.875% and 14.5% commission on the cash fee, the Panel seemingly agreed.  *See* Exh. G.  Accordingly, there is no basis to find the existence of a written agreement and, to the extent the Arbitration Panel did so in issuing its Award, it exceeded its powers and acted in manifest disregard with Virginia law.

## 2.    No Evidence Of An Oral Contract Was Introduced

Respondent has never offered evidence that would provide the existence of an implied or oral contract for the payment of the compensation he now seeks, although Respondent contends that he believed FBR's unwritten commission program covered all transactions on which he worked, the evidence presented showed that FBR never made such a promise.  Moreover, at no time does Respondent contend that any verbal agreement for payment of the stock fee was

reached with FBR. Indeed, Respondent has never offered evidence proving the existence of an implied or oral contract for the payment of the compensation he now seeks. Similar to written contracts, the proponent of an oral contract has the burden of proving all the elements of a valid and enforceable contract. *See Adams, et al. v. Doughtie*, 63 Va. Cir. 505, 519 (Cir. Ct. Portsmouth 2003) (citing *Richardson v. Richardson*, 10 Va. App. 391, 396, 392 S.E.2d 688, 690, (1990), *rev'd on other grounds*, 263 Va. 20, 23, 556 S.E.2d 767, 768 (2002)). The essential elements of an oral contract are offer and acceptance, with valuable consideration. *See id*. Assuming, *arguendo*, that Respondent asserts contends FBR breached an oral contract, for the same reasons set forth above, no evidence was put forth at the hearing demonstrating the existence of an enforceable agreement. *See Dodge*, 415 Fed. Appx. at 488 (holding that plaintiff sales account manager failed to state a claim for breach of contract for unpaid commissions and noting that a presentation explaining an employer's announcement of changes to commission rates did not amount to an offer to enter into a contract).

### 3. Respondent's Claim Is Not Timely

In sharp contrast to Respondent Hans, upon leaving his employment with FBR in August 2008, Mr. Doyle entered into a severance agreement with FBR which addressed the payment of trailing commissions. The agreement arguably created a written contract with FBR in that the Arbitration Panel could have reasonably applied Virginia's five-year statute of limitations for a breach of a written agreement when entering its award in favor of Mr. Doyle. *See* VA. CODE § 8.01-246. Respondent had no such agreement with FBR and, as discussed, there was no other basis in the record for concluding that Respondent had a written agreement which was breached.

Because Respondent presented no evidence to support the existence of a written contract, Respondent is subject to the three-year statute of limitations for oral or implied contracts. Respondent could establish the existence of an oral contract, which he cannot, his breach of

contract claim is nevertheless barred by Virginia's three-year statute of limitations applicable to oral agreements.  VA. CODE § 8.01-246 provides:

> [A]ctions founded upon a contract, other than actions on a judgment or decree, shall be brought within the following number of years next after the cause of action shall have accrued:
>
> 2. In actions on any contract which is not otherwise specified and which is in writing and signed by the party to be charged thereby, or by his agent, within five years whether such writing be under seal or not; . . . .
>
> 4. In actions upon any unwritten contract, express or implied, within three years.

Respondent maintained that the statute of limitations did not begin to run on his breach of contract claim until FBR received cash payment for the sale of XL Health stock in March 2011. However Respondent's argument is contrary to clear and established Virginia law and undermined by his own testimony that he asked to be paid commissions on the stock fee to Mr. Billings in late July or August 2008.  Ex. E at pp. 164-167.   In Virginia, if a contract is represented by "one single and indivisible contract and the breach gives rise to one single cause of action, it cannot be split into distinct parts and separate actions maintained for each." *Jones v. Morris Plan Bank*, 168 Va. 284, 191 S.E. 608, 609 (1937); *see also Corinthian Mortg. Corp v. ChoicePoint Precision Mktg., LLC*, 2008 U.S. Dist. LEXIS 53573, at *11 (July 14, 2008 E.D. Va.) (statute of limitations begins to run from the date of the wrongful act).  Respondent's breach of contract claim arose when FBR did not issue him XL Health stock or commissions based on the value of that stock in June 2008 when FBR received the stock.  While Respondent argues that the alleged breach did not occur until FBR liquated the XL Health stock in March 2011, Respondent's claim for breach of contract with respect to additional compensation owed on the

cash fee cannot be separated from his allegation that FBR did not issue him XL Health stock or pay him the cash value of the stock at the time FBR received XL Health stock in June 2008. Inasmuch as Respondent testified that he believed he was owed additional compensation in late July or early August 2008, he cannot now attempt to claim that his breach of contract claim did not accrue until March 2011 to avoid the statute of limitations.  Accordingly, the Arbitration Panel's decision to render an Award in favor of Respondent exceeded its power and was made in manifest disregard of Virginia's well-established law.  The only conclusion that can be reached is that despite having knowledge of the applicable law, the Arbitration Panel chose to disregard the law with respect to Respondent, and instead letting their desired result to equally award Respondent and Mr. Doyle − without a basis for doing so − drive their Award.  As such, the Award should be vacated in in part as to Respondent Hans.

## IV.    CONCLUSION

The Arbitration Panel exceeded its power and acted in manifest disregard of well-settled Virginia law.  Accordingly, the Award should be vacated in part as to Respondent Hans.  For all of the foregoing reasons, FBR's Petition to Vacate the Award to Peter D. Hans should be granted.

Dated:  April 19, 2013                    Respectfully submitted,


                                          /s/ S. Libby Henninger
                                          Paul J. Kennedy (Bar No. 428623)
                                          S. Libby Henninger (Bar No. 976352)
                                          Littler Mendelson, P.C.
                                          1150 17th Street, N.W., Suite 900
                                          Washington, DC  20036
                                          (202) 842-3400  Telephone
                                          (202) 842-0011  Facsimile
                                          pkennedy@littler.com
                                          lhenninger@littler.com


                                          *Counsel for Petitioner*
                                          *FBR Capital Markets & Co.*


Firmwide:119800386.2 028606.1027